IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **VALERIE TAYLOR,** | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) No. 09 C 5533 |
| **TEMP-AIR,** | ) ) |
| Defendant. | ) ) |

**MEMORANDUM OPINION AND ORDER**

Valerie Taylor ("Taylor") sued her employer, Temp-Air, for sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. In response, Temp-Air filed a counterclaim, seeking to recover wage and benefit payments it made on Taylor's behalf while she was on medical/disability leave.[1] Temp-Air has moved for summary judgment with respect both to Taylor's complaint and to its counterclaim. For the reasons explained below, the motion is denied as to Taylor's complaint; the motion is granted in part and denied in part as to Temp-Air's counterclaim.

I.

Temp-Air provides temporary heating, cooling, and ventilation systems to the construction industry. In August 2007, Temp-Air

---

[1] In her original complaint, Taylor asserted a claim under the Americans with Disabilities Act ("ADA") in addition to her sex discrimination claim. She later moved to amend her complaint and withdrew the ADA claim. *See* Doc. 15.

hired Taylor as a Technical Field Representative ("TFR") for its office in Elgin, Illinois. During the time period in question, the Elgin Office employed three other TFRs, all of whom were male. Each TFR was generally assigned to a specific territory in the Illinois/Chicagoland area. In addition, each TFR maintained a list of his or her own customers who could not be contacted by other TFRs. Taylor's territory initially included an area south of Chicago as well as northwest Indiana.

In December 2007, after six months on the job, Taylor was seriously injured in a car accident. After returning to work in November 2008, Taylor was told that she had been assigned to a new territory covering the northern and central part of Indiana, and that her old territory and customer list had been assigned to another TFR. She claims that unlike the other TFRs, she was not given a customer list to work from, but instead was told that she would be responsible for developing a new list of customers from scratch. Moreover, when a partial customer list eventually was created for her, Taylor claims that, unlike the other TFRs, she was allowed no input into the customers who were included on the list. According to Taylor, the transfer was designed to set her up for failure. As of the time this motion was filed, she remained employed by Temp-Air but was on medical leave.

II.

"A plaintiff alleging sex discrimination in employment under

Title VII can proceed under either the direct method or the indirect, burden-shifting method of *McDonnell Douglas Corp. v. Green*." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008)(citation omitted). Taylor proceeds exclusively via the indirect method, according to which "(1) the plaintiff must establish a prima facie case of discrimination based on her membership in a protected class; (2) once a prima facie case is made, a presumption of discrimination is established and the burden shifts to the defendant to provide a legitimate, non discriminatory reason for the challenged action; and (3) once the defendant meets that burden, the plaintiff must establish that those proffered reasons were mere pretext." *Whittaker v. Northern Illinois University*, 424 F.3d 640, 647 (7th Cir. 2005).

I first consider whether Taylor has successfully established a prima facie case of sex discrimination. In order to make out a prima facie case, Taylor must show that: "(1) she is a member of a protected class, (2) she met her employer's legitimate job expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of the protected class received more favorable treatment." *Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 666 (7th Cir. 2008). There is no dispute that, as a woman, Taylor is a member of a protected class. It is therefore necessary to examine only whether Taylor meets the remaining requirements. I conclude that she has.

First, Taylor has cited sufficient evidence to indicate that she was meeting Temp-Air's legitimate job expectations at the time of the alleged adverse employment action (viz., the transfer to her new territory). Temp-Air does not dispute that for the six-month period between when she began at Temp-Air and when she became injured, Taylor's performance had been "very successful." Def.'s Resp. to Pl.'s Stmt. Add'l Fact ¶ 18. Nevertheless, Temp-Air contends that Taylor could not have been meeting its legitimate expectations at the time of her transfer because she was on leave during this period and was not working at all.

This argument is specious. Taken to its logical conclusion, Temp-Air's reasoning would sanction virtually any adverse employment action against an employee so long as the action was taken when the employee was on leave. Far from showing that she was not meeting Temp-Air's expectations, the fact that Taylor was on leave at the time of the transfer means that Temp-Air could not reasonably have expected her to work. *See, e.g.*, *Gladden v. Winston Salem State University*, 495 F. Supp. 2d 517, 523 (M.D.N.C. 2007) (holding that if the plaintiff was discharged during protected FMLA leave period, the defendant "would have had no legitimate expectation for him to be working during that time") (citations omitted); *Pettus v. American Safety Razor Co.*, No. Civ.A. 599CV000103, 2001 WL 418723, at *3 (W.D. Va. Mar. 29, 2001) (defendant could have no legitimate expectations that the plaintiff

would perform while she was on leave).

It is true that Taylor received a below-average rating when she was reviewed three months after she returned to work. *See* Def.'s L.R. 56.1 Stmt. ¶ 37. But this *ex post* determination cannot serve as an argument against Taylor's position, for as already noted, her theory is that the transfer was designed specifically to set her up for failure. *See, e.g.*, *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 746 (7th Cir. 2002) (stating that being set up for failure "is a perfectly good theory of discrimination").

The parties next dispute whether Taylor's transfer to a new territory constitutes an "adverse employment action." The term "adverse employment action" has been "defined quite broadly in this circuit." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). As explained by the Seventh Circuit, an adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 838 (7th Cir. 2008) (quotation marks omitted). Further, the Seventh Circuit has stated that the "question of whether a change in working conditions is materially adverse is one of fact, and can be resolved on summary judgment only if the question is not fairly contestable." *Hobson v. Potter*, 264 F. Supp. 2d 711, 713-14 (N.D. Ill. 2003) (quotation marks omitted).

Taylor has come forward with sufficient evidence to suggest that her transfer constituted an adverse employment action. When viewed in the light most favorable to her, the record indicates that the situation she faced following her transfer afforded her no real chance of success: being forced to develop a new customer list from scratch is a formidable enough task on its own; but according to Taylor, the difficulty was exacerbated by the fact that she was required to travel long distances to meet with prospective customers. Attracting customers in Indiana was made more difficult still by higher shipping costs. Taylor claims that prior to her transfer, she was able to offer competitive pricing because she had substantial autonomy to offer shipping discounts to customers. After being transferred, Taylor testified that her supervisor, Steve Lupella, consistently made it difficult for her to take such measures. Pl.'s Stmt. Add'l Fact ¶ 35.

Finally, Taylor has cited evidence from which a jury could conclude that she was treated less favorably than similarly situated male employees. The parties' arguments center on two of Taylor's fellow TFRs in the Elgin Office -- Dan Lindahl and Jay Buthman. Temp-Air insists Taylor and Lindahl are not similarly situated because Lindahl has more experience than Taylor. While Taylor acknowledges that she has less experience at Temp-Air than Lindahl (whose employment with Temp-Air began in 1990), she points out that her sales experience goes back to 1993. Pl.'s Resp. to

Def.'s L.R. 56.1 Stmt. ¶ 32 (citing Pl.'s Ex. 24). Ultimately, however, it is unnecessary for Taylor to show that she and Lindahl are similarly situated, since Temp-Air apparently concedes that Taylor and Buthman are similarly situated. *See* Mem. at 6 (arguing that since Lindahl is not a comparator, "that leaves only Jay Buthman as a possible comparable to the extent that plaintiff satisfies the other elements of a prima facie case").

Having shown that she and Buthman are similarly situated, Taylor must produce evidence indicating that she was treated less favorably than he. The evidence recounted above satisfies this requirement: Taylor has cited evidence that, after the transfer, she was the only TFR required to make sales without a customer list; and that when a partial customer list eventually was developed for her territory, she had no say concerning the customers included in the list. She also points to evidence and that none of the other TFRs' territories required them to travel distances as far as Taylor was required to travel. In short, Taylor has come forward with sufficient evidence to support her claim that she was the only TFR negatively affected by Temp-Air's reconfiguration of the sales territories, and that the change was designed to set her up for failure.

Because Taylor has successfully made out a prima facie case of sex discrimination, the burden shifts to Temp-Air to provide a legitimate reason for transferring Taylor to the new territory.

Temp-Air claims that it assigned the Indiana territory to Taylor because of her prior success in selling to customers in Indiana. Moreover, Temp-Air contends that the territories were assigned to the various TFRs based on the location of their residences, and it points out that Taylor was assigned to the new territory because of all of the TFRs, her home was closest to it. Mem. at 8; Def.'s L.R. 56.1 Stmt, ¶¶ 25-26. This explanation suffices to meet Temp-Air's burden of furnishing a non-discriminatory reason for Taylor's transfer.

Accordingly, the burden shifts back to Taylor to show that Temp-Air's explanation is pretextual. In attempting to establish pretext, Taylor cites the evidence of disparate treatment discussed above. Beyond this, however, she adds that when she expressed her concerns to Lupella about the difficulties she faced in developing her new territory, Lupella "would tell her that it should be easy for her to get customers because she is a woman." Pl.'s L.R. 56.1 Stmt. Add'l Facts ¶ 36. Taken together, the evidence adduced by Taylor is sufficient to raise a triable issue of fact on the question of pretext.

To be sure, Lupella's alleged comments are different from the kind of derogatory or misogynistic remarks that typically form the basis for sex discrimination claims. Indeed, although the record is not entirely clear on this point, it is possible that Lupella intended the remark as a compliment. Nevertheless, comments such

as these are actionable where they betoken an employer's reliance upon impermissible gender stereotypes. *See, e.g.*, *Dow v. Donovan*, 150 F. Supp. 2d 249, 265 (D. Mass. 2001) (based on "admissions by several partners in their affidavits that they considered her gender as a positive attribute in making their employment decision . . . , a reasonable jury could find that plaintiff was evaluated and judged on account of her gender, and that the decision to deny her partnership was affected by negative gender stereotypes"); *see also Zhao v. State University of N.Y.*, 472 F. Supp. 2d 289, 311 (E.D.N.Y. 2007) ("If it is demonstrated that an employer is making any employment decisions based upon these impermissible stereotypes and an employee subsequently suffers an adverse employment action that potentially implicates such stereotypes, a jury may reasonably infer that the adverse employment action resulted from the impermissible stereotyping, as opposed to the proffered non-discriminatory reason for the action."); *cf. Kang v. U. Lim America, Inc.*, 296 F.3d 810, 819 (9th Cir. 20020 (evidence was sufficient for jury to conclude that plaintiff was subjected to adverse employment conditions and ultimately fired based on his failure to conform to positive ethnic stereotypes).

For this reason, Temp-Air's attempts to rely upon the so-called "common actor presumption" (or "same actor presumption") is misplaced. The common actor presumption provides that "when an employee is hired and fired by the same decision-maker in a

relatively short time span, a presumption, or inference, of nondiscrimination arises." *Chiaramonte v. Fashion Bed Group, Inc., a Div. of Leggett & Platt, Inc.*, 129 F.3d 391, 399 (7th Cir. 1997). In *Chiaramonte*, the defendant hired the plaintiff at the age of fifty-two. The defendant retained the plaintiff after a merger, but fired him two years later. Explaining the rationale behind the common actor presumption, the court stated that it was "highly doubtful that a person who hires an employee in the protected age group, and chooses to retain that employee after a merger, would fire that same employee less than two years after the retention as a result of a sudden aversion to older people." *Id.* (quotation marks omitted).

In this case, Lupella was involved both in hiring Taylor in August 2007 and in transferring her in November 2008. Temp-Air suggests that it is highly doubtful that after hiring Taylor, Lupella would develop an animosity towards women, causing him to transfer Taylor to a new territory in which she was destined to fail. This line of reasoning does not apply here, because it is not necessary to assume that Lupella harbored animosity towards Taylor. It is sufficient if Lupella's decision to assign Taylor to the new territory was affected by sex- or gender-based stereotypes, and that these resulted in Taylor's alleged adverse employment action (if, for example, Lupella's decision to transfer Taylor was guided by the notion that because of her gender, she could be

expected to fare better than her male counterparts).

In short, Taylor has come forward with sufficient evidence to defeat Temp-Air's motion for summary judgment on her claim for sex discrimination.

**C.     Temp Air's Counterclaim**

In its counterclaim, Temp-Air first seeks to recover $398.97 for an insurance premium payment it made on Taylor's behalf while she was on unpaid leave. Taylor's response on this point is somewhat puzzling. She does not dispute that Temp-Air made the payment on her behalf. She also does not dispute that under Temp-Air's policy, employees are personally responsible for paying their share of their health insurance premiums when they are on unpaid leave. Moreover, Taylor acknowledges that she attempted to pay as much of the premium as she could afford while she was on leave. Pl.'s Resp. Def.'s L.R. 56.1 Stmt. ¶ 41. (Since the full amount of the premium payment is $473.76, it appears that Taylor paid roughly $75 of the cost).

Nevertheless, Taylor denies that she has any obligation to reimburse Temp-Air. She appears to argue that at the time Temp-Air made the payments, she was unaware of her obligation to make the premium payments. Yet this claim appears to conflict with her admission that she received several letters from Temp-Air's human resources personnel explaining her responsibility for paying the premiums. And even if Taylor was unaware of the obligation at the

time, that would not make the obligation any less real.  Taylor says that she never asked Temp-Air to make any payment on her behalf.  But in light of her many heath problems, it seems disingenuous to suggest that she would have preferred for the premium to go unpaid and to have her health coverage jeopardized.

In short, Taylor has failed to offer a coherent response to Temp-Air's counterclaim for the health insurance premium payment it made on her behalf.  Accordingly, Temp-Air is entitled to summary judgment as to this portion of its counterclaim.

Temp-Air also seeks repayment from Taylor in the amount of $1,153.85 for a week in which she received her salary but allegedly performed no work.  Taylor appears to agree that she was overcompensated, but she cites evidence suggesting that she worked for at least some portion of the week in question (near the end of February and beginning of March 2009).  Temp-Air makes much of the fact that Taylor admitted in communications with the company's human resources department that she owed Temp-Air a full week's pay.  However, when she was later asked how much she owed Temp-Air for days on which she was paid without working, she said she was unsure.  Nor, despite Temp-Air's assertion to the contrary, did Taylor concede in her answer to Temp-Air's counterclaim that she owes the $1,153.85 amount.  Given the ambiguity in the record on this point, Temp-Air's motion for summary judgment is denied insofar as its counterclaim for $1,153.85 is concerned.

III.

For the reasons discussed above, Temp-Air's motion for summary judgment is denied respect to Taylor's suit; its motion is granted in part and denied in part with respect to its counterclaim.

ENTER ORDER:

_____
**Elaine E. Bucklo**
United States District Judge

Dated: December 16, 2010